Good morning, your honors. Charles Talbot representing Mr. Goodman. I'd like to reserve one minute for rebuttal. This case presents a variety of issues in a social security disability context. Given the number of issues, I'll have to limit my presentation this morning. The first part of my presentation raises an issue that's not yet been decided by this court, and that is whether medical appointments of a frequent nature are sufficiently disqualifying for a person to be able to be employed and therefore result in a finding of disability. I thought he was working nights. What would prevent him from going to the doctor during the day? He wasn't working nights. Didn't he have a job that he quit because it called for nighttime duties and he wanted to spend more time with his children? He did, but that was a very short-term type job. If we adopt the rule that you want us to adopt, wouldn't that be relevant to the administrative law judge's determination as to whether the frequency of medical appointments would interfere with his ability to hold down full-time employment? It would depend, I think, on the type of employment. It would have to be determined on a case-by-case basis. What would we do with hypochondriacs? Well, that would be present in the record, I assume. I'm asking you to help me write the opinion here. You want us to answer what you say as a question of first impression, but I want to try and tease out how broadly you're asking us to rule because I can see unintended consequences here if we were to simply adopt a black-letter rule that says if you have 100 medical appointments in a year, that prevents you from holding down a full-time job. Well, in the context of this case, Mr. Goodman made multiple attempts to work after he left the service, and it was determined by the judge that those attempts were unsuccessful work attempts. He never had a full-time job involving night work. Oh, so he didn't take the night job, he just refused it because... I think he tried to work for a short period of time, and it was a combination of not being away from the family and also his medical problems, the residuals of his medical problems. But I thought he said the reason he quit that job was because he couldn't spend time with his children. Yeah, but he also had interfering medical problems, the symptoms from his medical problems. The medical problems showed themselves at night instead of during the day? They showed themselves 24 hours a day. And why would the medical problems cause him to leave night work and not leave day work? I'm puzzled. Well, he was subject to significant pain. During the night or during the day? Both. But he has a full-time job now, does he not? No, it's part-time. It's a part-time job with the rescue mission. And the job ended the application for disability. That's why it was amended to a closed period. Is that because he's working too many hours to qualify? Earning too much money. He's not working the hours, it's too much money. And it's not very much over the substantial gainful activity limit. Counsel, going back, I don't want to keep beating a dead horse, but I understand he quit. The record reflects that he quit Harris Company because he wanted to spend time with his children, and it doesn't say anything else about reasons why he quit. Is that correct? Yes. But he also left other jobs because he was unable to do them, and they were day jobs. And the court, there was a suggestion below that, well, he can go work. If he has a day job, he can go work after hours. He can go to the doctor after hours. Well, in hospitals and clinic settings, with the exception of emergency rooms and hospital settings where you have patients, the doctors and therapists work regular hours like everyone else, and you just can't keep taking the time off. Unless you have a night job. Perhaps. I mean, a lot of people work nights. I understand. In a lot of different areas of the economy. But this fellow had over 100, the relevant period of time was in the hospital or the clinic or the therapist over 100 times. What's your answer to my hypothetical about the hypochondriac claimant who just makes medical appointments because he or she imagines that they have medical issues? I mean, that would require us to declare that they're disabled simply because they have lots of doctors appointed. Well, we don't have that in this particular case. We have a 15-year vet who had four years or four tours in Iraq and four tours in Afghanistan, and he was subject to 22 close blasts. Counsel, I wasn't going to mention anything about that. But since you got it up, the record seems to support four tours and not eight. But is it your position he served eight, not four times, once in Afghanistan and three times in Iraq? My understanding was four and four, four in Iraq and four in Afghanistan. What is your understanding based on? Based on the military records that were submitted. My notes indicate that Mr. Goodman's military records unambiguously state that he deployed four times once to Afghanistan and three times to Iraq. On his DD-2014, the Military Summary of Services, this information is reflected in his awards. Are we to take that into consideration? Yes, and it was my understanding to the contrary, based on other information in the record from the- It doesn't really have to do with his physical condition, though. Well, it doesn't, and- All right, then let's leave that aside. Well, he comes back. His last tour in Afghanistan was cut short because he had to be medevaced back to the United States, and that was the start of his disability. He's had three back surgeries, one jaw surgery, and he's got a 100% VA disability rating. So with the frequency of medical appointments and medical visits, when that information was presented to the vocational expert at the hearing, he said if you miss more than one day a month, you can't hold down a job. And obviously Mr. Goodman has so many medical appointments that it would interfere with normal work. The next issue concerns the residual functioning capacity assessment by the ALJ. She ruled that, or she found that the claimant had a light exertional ability, whereas DDS, which is the agency that reviews these cases and establishes physical limits rated Mr. Goodman at the sedentary level. That fact alone would disqualify Mr. Goodman from any of the jobs that were named by the vocational expert in response to the questions posed to the vocational expert by the ALJ. We also have the VA decision rating Mr. Goodman as 100% disabled, and that was rejected by the ALJ on the basis that his activities of daily living, his attempts at work, and that the VA system, VA rating was based on speculation. The attempt at work was ruled by the judge as failed work attempts. So it seems a bit contradictory to say on the one hand that attempting to work is a indication. The ALJ found that Goodman had engaged in activities during the period that belied his disability rating, including in July 2013, two months after one of his surgeries, Goodman played 18 holes of golf. In October, after another surgery, he went to the zoo and drove to the clinic for examinations. In 2014, he says he's golfing three times a week, rebuilding his truck daily, scuba diving twice a week, riding horseback once a week, participating in archery once a week, glass blowing once a week, and attending Boy Scout retreat. Most of those were prior activities before his disability. In 2014? The reference to golf is the fact, and she never asked the claimant about these activities at the hearing for any kind of explanation. Were they disputed? Not when you go out with your buddies and sit in a golf cart while they're playing golf, and that's what he did. He wasn't playing golf per se. He was riding with his buddies in a golf cart. Did he so testify? No, because that was never asked. Then let's take to the record. I understand. The VA rating based on speculation comment comes from the fact that the VA examiners were uncertain as to whether or not the disability, the biggest portion of the rating of the disability, was either from the PTSD or the brain injury. And they said that the symptoms of both can be confused, but when combined, it was very significant. Moving on. The ALJ did mention that Goodman's TBI, traumatic brain injury, screenings were positive. His screening in 2008 showed him to be asymptomatic for potential head injuries. His TBI screening in 2013 was negative for cognitive functioning requirement. Isn't that objective medical evidence which contradicts the claims of head injury? Yeah, but if you read the VA rating decision itself and the summary of the medical information that's in there, the comment was that there was some evidence of TBI and it was PTSD and it was uncertain as to how much was to be given to either one or the other. Well, what's the ALJ to do with that? There's a comment that some symptoms are self-reported and there's objective medical evidence that contradicts those symptoms. Is the ALJ not able to determine which is more convincing? No, but when you put the two pieces together, there's no speculation. The VA doesn't give 100% ratings based on speculation. They base it on medical evidence, and the medical evidence in this case supported that such a finding. Well, if that were so, we'd have to grant 100% disability when the VA finds 100% disability, right? Well, this court's Moncardi decision in 2002 says that great weight should be given to the VA decisions unless there's an explanation of why they shouldn't be. But we also said that it doesn't compel the finding that he's 100% disabled. I understand. Okay. It's a factor that, and the ALJ did consider it, did she not? She did, but in the 16 years since Moncardi has come out, I've not experienced a single case where 100% VA disability rating from the VA was given any significant effect. And we see a lot of those cases in this area because of the proximity of the various military bases and the retiree population that's here. And uniformly over the years, ALJs have really not said much about giving any effect to VA decisions. And, in fact, the new regulations that have been published and are going into effect or have gone into effect even further distance the agency from VA decisions, saying we're not bound by any other agency decision of the federal government. We're just going to look at the medical records that were the basis for that decision, and we'll make our own decision. Well, the ALJ, I'm looking at pages 32 and 33 of the record, I guess 9 and 10 of the ALJ's decision, does reference the occupational therapy report from Madigan Army Medical Center, and it includes on the top of page 33 reference to the function report, which I assume was from oral interview of the claimant, in which he stated that he got his kids ready for school, participated in employment-seeking activities, did light household chores, fed and bathed his children, put them to bed, did yard work, et cetera. And basically the administrative law judge cited that evidence to say, you know, I think his daily activities are more pervasive than he's saying they are. Yeah, but contrast that with the lay witness evidence from his wife, which the judge really didn't consider. There were two lay witness statements from the wife. One was a third-party function report submitted shortly after the filing of the claim, and the second was a later report submitted by her in which she talks about the fact that it's very difficult for him to get up in the morning because of his physical problems. She has to help him bathe. She has to help him get dressed. He doesn't do a lot of activities around the house. He used to be a great cook. He can't do that anymore. And that was not considered by the judge in the decision. Isn't that what he's talking about on pages 32 and 33, pages 9 and 10 of his report? I mean, he's directly addressing the testimony offered by the wife, Peggy. So you can't say he didn't consider it. I mean, you may not like how he considered it, but she certainly didn't ignore that evidence. The judge didn't give any weight to that. She mentioned it, but there's no weight given to that report. Well, she concludes the last full paragraph at the bottom of the page on 32 that, as to activities of daily living, that the claimant has mild restriction and then goes on to recount the wife's testimony. So, I mean, are you really arguing about how the ALJ evaluated the evidence? Is that what you're asking us to do, sort of re-weigh the evidence? No, I'm asking the judge talked about it, but she didn't talk about what consideration she gave to it. She just mentioned that it was there. She didn't even talk about the first one at all. Counsel, I'm looking at a long paragraph in very small type where the ALJ goes into great discussion of the wife's testimony. I'm not sure I understand your argument. It sounds to me like you're quarreling with the conclusion, not with the procedure that the ALJ followed. Like I said before, she didn't say to what, and she talks about it, she mentions it, but she doesn't say what weight she gives to that testimony. The case law requires that. Well, isn't that what mild restriction means? To me, that's an indication of her conclusion based on all of that evidence. She's willing to acknowledge that there are some limitations, but that the ALJ thought they were mild in the face of this evidence. Well, that's certainly different from what the wife says. Okay. All right. We've taken you over your time. We'll give you a minute for rebuttal. Thank you, Judge. Counsel. Good morning. May it please the Court, Jeff Staples here for the Commissioner of Social Security, who asks that you affirm the district court's judgment because the ALJ's decision is supported by substantial evidence. As counsel pointed out, there are a lot of issues in this case, so I'm going to try to hit the high notes, but if the court has any specific questions, please feel free to interrupt me. On the issue of too many medical appointments equals disability, Social Security ruling 96-8P really addresses this pretty squarely, and that says that the residual functional capacity assessment can include only limitations and restrictions attributable to medically determinable impairments. So the argument here is that a scheduling conflict between Goodman and his doctors is synonymous with a disability, but a scheduling conflict is not a medically determinable impairment. So that's why the ALJ reasonably declined to include the frequency of medical appointments in the residual functional capacity assessment. The ALJ, nevertheless, found that Goodman was limited to light work with some additional restrictions, and in doing so, the ALJ took a look at all of the evidence and reasonably reached that conclusion. For example, we talked about Dr. Platter's opinion for a little bit. Dr. Platter thought that Goodman was limited to sedentary work, but just a few months later, Goodman testified that he was lifting 50-pound boxes throughout the day, which seriously undermined Dr. Platter's opinion, and so the ALJ reasonably chose to give that opinion less weight. As for the VA disability rating, the VA was under the impression that Goodman is 100% permanently and totally disabled, permanently disabled. However, there's no dispute that Goodman went back to work shortly thereafter at substantial gainful activity levels. So the ALJ took a look at those two things, in addition to the objective medical evidence that the VA referenced that tended to contradict the allegation of disability, and chose to give it less weight for valid reasons. Counsel, what's the government's position regarding the supplemental authority you submitted? We submitted that in an abundance of caution just because they seem to touch on possibly similar issues. I don't have any specific argument related to BISTEC. Would you make some as it relates to this case? You want me to talk about the... The question that your supplemental authority speaks to the question presented and what the Supreme Court granted on certiorari. Do you think it, you would not have presented it if you didn't think it applied to this case. Assuming it applies to this case, what's the government's position? As to how the... Well, let's parse this. Okay. Do you, in this case, do you agree that there was a request to provide the underlying data which the testimony of the expert was premised? Yes. So there was a request for a subpoena in this case prior to the administrative hearing, and the ALJ did not grant that request. However, this case is different than... That's what I'm trying to get to. Sorry. Why is this case different? Sorry, Your Honor. This case is different because the ALJ, because the Goodman's attorney was permitted to question the vocational expert and ask the questions that he had about what was the foundation for the expert's testimony. And so he asked some questions about how was the expert deriving the job numbers that he was providing, and the expert fully answered those questions. And then following that, there was no request to see, you know, how he did his math or whatever it was. That was, you know, it was kind of a no-further-questions situation. So he got the answers that he wanted at the administrative hearing. And then it was only after the ALJ issued her decision that there was this additional vocational resource evidence produced, and that doesn't undermine the ALJ's decision at all. So those are distinct factual scenarios, Your Honor. I'm not sure I understand you. I'm looking at the question presented. Whether a vocational expert's testimony can constitute substantial evidence of other work when the expert fails upon the applicant's request to provide the underlying data on which the testimony is premised. Yes, Your Honor. There's something different about the facts in the case that was certified than our case? Yes, Your Honor. In Bystec, the claimant's attorney asked the vocational expert to produce documentation supporting the testimony that I don't remember he or she was giving. Okay. Here. As to jobs available in the national economy? I believe so, Your Honor. I don't remember exactly what the evidence they were seeking to get was, but I believe so. Here, there was no such request at the administrative hearing. So here, Goodman's counsel questioned the vocational expert, got answers to his questions, and did not ask to see the underlying, the data underlying those answers. I thought you said there was a request for assessment. There was a request prior to the hearing that the ALJ make the vocational expert bring the data with him. And at the hearing, nobody asked to see it. No one asked for. . . Well, they went and got their own expert. Yes, Your Honor. But that's only after the fact. And furthermore, it's after the ALJ's decision. But it's part of the record, isn't it? It's part of the record before this Court, but it's not part of the administrative record, Your Honor. But it was before the agency, and the decision is not final until the appeals counsel rules on the appeal, right? That's correct, Your Honor. So Goodman submitted the extra vocational evidence to the appeals counsel. But the government didn't supplement the record with whatever it was that the V.E. had relied on. That's correct. The appeals counsel did not put that evidence into the record. And under Taylor, the Court's not permitted to review the appeals counsel's decision. But Sentence 6 of 42 U.S.C. 405G provides an avenue for claimants to bring evidence that's absent from the administrative record in front of a court. However, there are requirements. The new evidence must be material, and the claimant must have good cause for not having presented it earlier. Now, in this Court's Mays decision, which is cited in our brief, the Court considered evidence that was submitted to the appeals counsel, but the appeals counsel did not include it in the record, just like here. But the Court held that the claimant did not have good cause for failing to submit it to the ALJ earlier, and that's exactly the same as here. There's no reason. Goodman was on notice of what the vocational expert testified about at the administrative hearing. His second vocational resource commented on the testimony of the vocational expert at the hearing, but there's no reason he couldn't have put that in front of the ALJ before the ALJ issued his decision. Or, if he had thought that he needed more time to get that extra evidence, he could have asked for it, but he didn't. So under this Court's precedent in Mays, he does not have good cause for asking for sentence 6 relief based on that evidence. Does the record show that the V.E. at the hearing was in possession of the documentation that had been subpoenaed or that was the subject of the request for the subpoena? Not to my knowledge, Your Honor, but my recollection is that nobody asked about it. I understand that, but I guess all I was trying to determine was whether or not the V.E. had the information in his or her possession, but because nobody asked for it, it was never produced. That would be speculation on my part, although I know most of the – I mean, counsel would know more about that. He does administrative hearings, but I think most of the time they use a computer, so I think it's possible that the V.E. had it. I don't know, Your Honor. All right. And as Judge Bea pointed out, substantial evidence supports the LJ's decision because of Goodman's robust daily activities and ultimately his return to work. Unless there are any further questions, I will ask that you affirm the district court's judgment. Thank you. Thank you very much. All right. We'll give you a minute for rebuttal. Mr. Talbot. Thank you. On the issue of the vocational information, the request for a subpoena due to take them to ask the vocational expert to bring the data upon which they were going to rely for their testimony to the hearing was not granted or denied. It was ignored. But why didn't you ask for it when you were cross-examining the V.E.? Well, I didn't ask, but it's been my experience over the years that judges routinely deny such a request. Yeah, but, I mean, you're in the middle of the hearing and you're crossing the witness. Why can't you ask on what basis do you base your opinion? Show me the evidence. Well, you've asked two questions. Upon what basis we always ask, and they either say a source like U.S. Publishing or Job Browser Pro, and if they don't come up with that, it's based on their education and their experience, which is, you know, whatever that means. But they don't bring typically any information with them to the hearing. What they do is they just talk about jobs and numbers and nothing else, and it's typically on a computer. You didn't ask the question because they don't usually have anything to produce. They don't have it there. No. And so we submitted. Can I ask, what more would you expect the V.E. to have reviewed beyond what they typically rely on? Well, what the problem is is that the government, Department of Labor, does not identify job numbers by discrete DOT code. That's not information that's available from the federal government. There's two non-government sources for that information. It's either U.S. Publishing or Job Browser Pro from skilled trainers. So is your answer to my question is there really isn't any other information available that would support their conclusions? The two sources, Job Browser and U.S. Publishing, are available, but oftentimes they give testimony that doesn't match what those programs provide, and that was what happened in this particular case. The first two jobs that were identified by the V.E., the V.E. we had to hire clearly provide documentary evidence that showed that the job numbers that testified to by the V.E. at the hearing had no basis in the support, and it was submitted to the Appeals Council. They referenced having received it, but they rejected it on the basis that it doesn't change anything, which seems a little odd when you consider. Was that because the third available job was housekeeping? Yeah, housekeeping, and the V.E. said that's way beyond the physical abilities of the claimant because you don't get to sit down and stand or walk. I mean, you're all standing eight hours a day, which is beyond what's normally expected out of light work. Okay. Thank you very much, Mr. Talbot and Mr. Stables, and we'll submit the case. Thank you for your oral argument, and that ends our calendar for the week, and we stand adjourned.
judges: Tallman, Bea, Black